## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **Crim. No. 12-CR-00119 (JEB)** |
| | **:** | |
| **KIM H. OCASIO,** | **:** | |
| **Defendant.** | **:** | |
| | **:** | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in aid of sentencing. For the reasons set forth herein, defendant should be sentenced to a period of probation that includes as one of its conditions a six-month period of home detention. This approach would provide just punishment for defendant's offense as well as take into account the seriousness of her recent misrepresentations following her guilty plea.

### Summary

The government respectfully submits that the factors set forth at 18 U.S.C. § 3553(a) support a sentence of a period of probation that includes as one of its conditions a six-month period of home detention, a sentence which is at the top of the Stipulated Guideline Range set forth in the parties' plea agreement, but which is at the bottom of the new Guideline Range arrived at by denying defendant a two-point reduction for acceptance of responsibility. The parties agree that defendant's post-plea, false statements warrant a denial of the two-point reduction for acceptance of responsibility. The government's recommended sentence is a fair sentence that reflects the seriousness of defendant's offense to which she pled guilty as well as

the seriousness of her post-plea criminal conduct, and takes into account the need for specific and

general deterrence.  Moreover, this sentence ensures that similarly situated defendants are treated

similarly for, as described below, it is the same as the sentence imposed on another former

background investigator who, like the instant defendant, entered an early guilty plea to the same

offense, received the benefit of a loss amount capped at $10,000, then engaged in post-plea false

representations in conjunction with an application for employment.[1]

## I. **Offense Conduct**

During the plea proceedings, defendant agreed with the Statement of Offense submitted

to the Court by the government, which has been incorporated into the Presentence Investigation

Report ("PSR").  (See PSR ¶¶ 10-16.)  In summary, defendant, a 49-year-old former Special

Agent for OPM's Federal Investigative Services ("OPM-FIS"), falsified work on background

investigations of federal employees.  Between October 2011 and February 2012, in more than

four Reports of Investigations ("ROI's") on background investigations, defendant represented

that she had reviewed a record regarding the subject of the background investigation when, in

truth and in fact, she had not obtained the record.  These ROI's were utilized and relied upon by

the agencies requesting the background investigations to determine whether the subjects of the

investigations were suitable for positions having access to classified information, for positions

impacting national security, or for receiving or retaining security clearances.

---

[1]In the case of Ronald G. Payton (08-CR-153 (CKK)).

II. **Defendant's Plea**

On May 4, 2012, the government filed a one-count Information charging defendant with Making a False Statement, in violation of 18 U.S.C. § 1001.  On May 30, 2012, defendant pled guilty to the Information.  Sentencing is now set before the Court on August 30, 2012, at 4:00 p.m.

As set forth in the written plea agreement, defendant and the government agreed that the defendant's base offense level under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") is 6, pursuant to U.S.S.G. § 2B1.1(a)(2).  (PSR ¶ 5.)  Defendant and the government also agreed to an addition of 2 levels for "Loss greater than $5,000," pursuant to U.S.S.G. § 2B1.1(b)(1)(B), and a two-level enhancement for abuse of a position of trust, pursuant to U.S.S.G. § 3B1.3.  (Id.)  Pursuant to the plea agreement, defendant was supposed to be entitled to a two-level decrease in the offense level based upon her acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a).  (Id.)  Furthermore, the parties agreed that neither party will seek a sentence outside the applicable guideline range pursuant to 18 U.S.C. § 3553(a).  (Id.) However, according to the plea agreement, the government may seek denial of the adjustment for acceptance of responsibility if defendant engaged in additional criminal conduct after signing the agreement. (Plea Agreement, Dkt. No. 7, ¶ 11.)

III. **Defendant's Post-Plea Conduct**

Following the discovery of falsifications by defendant, OPM-FIS placed defendant on paid administrative leave effective March 6, 2012, pending the results of an internal investigation.  (3/5/12 Memo from Benson to Ocasio, attached hereto as Exhibit 1.)  In addition, OPM-FIS suspended defendant's Top Secret Clearance and informed defendant of this suspension in a letter dated March 6, 2012, for which defendant signed upon delivery on March 9, 2012.  (3/6/12 Letter from Price to Ocasio with delivery card, attached hereto as Exhibit 2.)  On April 9, 2012, defendant and her attorneys participated in a meeting with the government at the United States Attorney's Office regarding defendant's falsifications.  On April 11, 2012, defendant informed OPM-FIS that she was resigning from her position effective April 13, 2012.  (4/11/12 Letter from Ocasio to Benson, attached hereto as Exhibit 3.)  On May 3, 2012, OPM informed defendant that her security clearance from OPM, which had been suspended on March 6, 2012, was withdrawn as of April 13, 2012, the date of her separation from OPM.  (5/3/12 Letter from Stoepfel to Ocasio, attached hereto as Exhibit 4.)

A.      False Representations to the U.S. Department of Education

As mentioned supra, on May 30, 2012, defendant pled guilty to the charge of Making a False Statement and was released on her personal recognizance.  (PSR ¶9.)  Just over one week later, on June 6, 2012, defendant completed and submitted electronically to the U.S. Department of Education ("DOEd") a Questionnaire for Public Trust Positions ("SF-85P") in connection with her application for a position as a collection specialist with Sallie Mae in Indianapolis, Indiana, which would have her working on a DOEd contract.  In her SF-85P, defendant made the following three false representations:

- In Section 12, which asked defendant, <u>inter alia</u>, whether she had left a job by mutual agreement following allegations of misconduct or for other reasons under unfavorable circumstances in the last seven years, defendant answered "no," even though, as defendant well knew when she made this statement, she had resigned from OPM-FIS following allegations that she had falsified background investigation reports.

- In Section 18(b), which asked defendant whether she had ever had a security clearance or access authorization denied, suspended, or revoked, defendant answered "no," even though, as defendant well knew when she made this statement, her security clearance from OPM had been suspended on March 6, 2012.

- In Section 20, which asked defendant whether she had been arrested for, charged with, or convicted of any offense(s) in the last seven years, defendant answered "no," even though, as defendant well knew when she made this statement, she had been charged on May 4, 2012, in an Information with the offense of Making a False Statement and had pled guilty to that offense on May 30, 2012.

On June 6, 2012, defendant also signed by hand a certification that her answers on the SF-85P were "true, complete, and correct " to the best of her knowledge and belief and that she understood that a knowing and willful false statement on the SF-85P was punishable by a "fine or imprisonment or both" under 18 U.S.C. § 1001.

On June 25, 2012, defendant completed and submitted to the DOEd a Declaration for Federal Employment ("OF-306") in connection with her position as a collection specialist with Sallie Mae.  In her OF-306, defendant made the following two false representations:

- In response to Question 11, which asked defendant whether she is currently under charges for any violation of law, defendant answered "no," even though, as defendant well knew when she made this statement, she had been charged on May 4, 2012, in an Information with the offense of Making a False Statement, had pled guilty to that offense on May 30, 2012, and was pending sentencing on August 30, 2012.

- In response to Question 12, which asked defendant whether in the last five years she had, <u>inter alia</u>, quit any job after being told that she would be fired or left any job by mutual agreement because of specific problems, defendant answered "no,"

even though she well knew when she made this statement that she had resigned from OPM-FIS following allegations that she had falsified background investigation reports.

As she had done on the SF-85P, defendant signed a certification that her answers on the OF-306 were "true, correct, complete, and made in good faith" and that she understood that a false or fraudulent answer to any question on the OF-306 was "punishable by fine or imprisonment." Defendant's false statements on her SF-85P and OF-306 reflect a deliberate attempt to conceal her wrongdoing from those conducting her background investigation in order to obtain a job at Sallie Mae working on a DOEd contract.

B.    False Representations to an OPM Contractor

On August 12, 2012, defendant submitted an online application and resume to an OPM contractor, KeyPoint Government Solutions ("KeyPoint"), for a position as an Experienced OPM Investigator.  In her application, defendant falsely represented that she had an "[a]ctive clearance through [the U.S.] Department of Education," even though, as defendant well knew when she made this statement, defendant did not have an active security clearance with DOEd and had not applied for one.[2]  In her resume, defendant falsely represented that she "[h]eld a top secret security clearance for [the] duration of [her] job" at OPM, which lasted from "Jan 05 - April 2012," even though, as defendant well knew when she made this statement, her security clearance was suspended on March 6, 2012.  Defendant's false statements in her application and

---

[2]Defendant had submitted to DOEd an SF-85P, which, if positively adjudicated, allows one to hold a Position of Public Trust.  As an experienced federal background investigator, defendant well knew that only the submission of a Questionnaire for National Security Positions ("SF-86") triggers a background investigation leading to a security clearance.

resume reflect a deliberate – and audacious – attempt to conceal her wrongdoing at OPM from KeyPoint in order to obtain a job at KeyPoint working on background investigations for OPM.

## IV. **Defendant's Total Offense Level is 10**

Like the parties' plea agreement, the PSR has calculated defendant's adjusted offense level at 10. (PSR ¶ 26.) This includes the base offense level of 6 pursuant to U.S.S.G. § 2B1.1(a)(2), an addition of 2 levels for "loss" of over $5,000, pursuant to U.S.S.G. § 2B1.1(b)(1)(B), and an addition of 2 levels for abusing a position of trust, pursuant to U.S.S.G. § 3B1.3. (PSR ¶¶ 21-22, 24.) The PSR has also calculated defendant's total offense level at 10. (PSR ¶ 29.) Although defendant and the government had agreed in the Plea Agreement to a two-level reduction for acceptance of responsibility, the PSR writer properly concluded that the two-level reduction is not warranted here. (PSR ¶ 20a.) Defendant should receive no downward adjustment under U.S.S.G. § 3E1.1(a) in light of her failure to voluntarily terminate her criminal activities. For the reasons set forth, infra, in Part V of this Memorandum, the government is seeking imposition of a period of probation that includes a six-month period of home detention, which is at the bottom of the new Guideline Range of 6-12 months set forth in the PSR (¶ 72) and is the same as the sentence imposed on another former background investigator under similar circumstances.

A. Loss Valuation is Properly Calculated at Over $5,000.

As part of her plea before the Court, defendant has agreed that the total loss in this case is greater than $5,000. (See PSR ¶ 5.)

Valuation is governed by U.S.S.G. § 2B1.1(b)(1) and includes all relevant conduct. See U.S.S.G. § 1B1.3(a)(2) (same course of conduct or common scheme or plan as the offense of

conviction).  For purposes of sentencing, the "loss" is the greater of either the actual loss or the

intended loss.  U.S.S.G. § 2B1.1, comment (n. 3); <u>see also</u> <u>United States v. Manas</u>, 272 F.3d 159,

165 (2d Cir. 2001) ("Consistent with the provisions applicable to conspiracy cases, the

Commentary [of section 2F1.1] states that 'if an intended loss that the defendant was attempting

to inflict can be determined, this figure will be used if it is greater than the actual loss."), <u>cert.</u>

<u>denied</u>, 537 U.S. 1023 (2002);  <u>United States v. Studevent</u>, 116 F.3d 1559, 1561 (D.C. Cir. 1997)

(finding actual loss should not limit the amount of intended loss attributed to defendant's crime

under § 2F.1.1).  "Actual loss" means the reasonably foreseeable pecuniary harm that resulted

from the offense while "intended loss" includes pecuniary harm that was intended to result from

the crime as well as intended pecuniary harm that would have been impossible or unlikely to

occur (e.g., an insurance fraud in which the claim exceeded the insured value).  U.S.S.G. §

2B1.1, comment (n. 3(A)).

      The sentencing judge is "in a unique position to assess the evidence and estimate the loss

based upon that evidence," and the Court need only make a "reasonable estimate of the loss."

U.S.S.G. § 2B1.1, comment (n.3).  The Court need not determine the value of the loss with any

degree of precision; a reasonable estimate of the loss based on the available evidence will suffice.

<u>See</u> <u>United States v. Carter</u>, 412 F.3d 864, 839 (8th Cir. 2005); <u>United States v. Resurreccion</u>,

978 F.2d 759, 762 (1st Cir. 1992) (intended loss should be used in sentencing, even if imprecise,

when larger figure than actual loss).

      As already noted, defendant agreed in the written plea agreement to a loss amount greater

than $5,000.  (PSR ¶ 5.)  As Special Agent Newcomer explained in his attached affidavit, the

discovery and confirmation of a falsification by defendant in one of her ROI's required OPM-FIS

to undertake a full recovery effort to ascertain the depth and scope of defendant's falsification activities.  <u>See</u> Affidavit of OPM-FIS Special Agent David K. Newcomer ("Newcomer Affidavit" or "Newcomer Aff.") ¶ 6 (Exhibit 5 attached hereto).  Ultimately, OPM-FIS was required to rework 130 cases, which involved recontacting 335 sources.  (Newcomer Aff. ¶ 5.)  The Special Agents and administrative personnel assigned to this recovery project tracked the hours they spent working on this project, and each employee's hourly rate, including benefits, was used to calculate the overall cost of the project.  Most sources were re-interviewed in person, so the hours that were tracked included travel time to and from those sources.  In addition, the hours spent on the recovery project included time spent reviewing each case, scheduling new field work, writing up new ROI's, reviewing recovery fieldwork, correcting OPM's files to remove or replace inaccurate reports, and preparing the corrected cases for delivery to the requesting agencies. (Newcomer Aff. ¶ 7.)

        Unlike so many white-collar defendants who stubbornly resist admitting what they have done, defendant came in early and admitted her misconduct.  Her admissions, as well as her voluntary resignation from OPM, before the recovery effort was complete helped OPM-FIS focus its recovery effort and conserve resources.  In exchange for her early admissions and resignation, the government agreed to cap the loss amount at $10,000, which was the estimated, accrued recovery cost at the time of defendant's resignation.  (<u>Id.</u>)  Therefore, a two-level increase for a loss greater than $5,000 is appropriate.

B.  Abuse of a Position of Trust

In the plea agreement, the parties agreed to a calculation under the Sentencing Guidelines

that includes an adjustment for abuse of a position of trust.

Section 3B1.3 of the Sentencing Guidelines provides in pertinent part as follows:

If the defendant abused a position of public or private trust, or used a special skill, in a
manner that significantly facilitated the commission or concealment of the offense,
increase by 2 levels.

Defendant abused the trust given to her by OPM to conduct the required interviews and record

checks and accurately report the results of background investigations of applicants for top-secret

security clearance, positions of trust, and other positions.  Defendant received OPM-approved

training to conduct background investigations with the utmost professionalism and integrity.  As

a background investigator, defendant agreed to abide by OPM's policies and procedures,

including coverage requirements for investigations, required areas of inquiry for all source

interviews, and reporting requirements.  She was obligated to paint a complete and accurate

picture in her ROI's of applicants for security clearance after conducting every required interview

and record check, and she was required to exercise significant professional discretion in deciding

who were the "best sources" to interview for each background investigation.  Unable to re-

interview every source and recheck every record, OPM supervisors relied upon defendant's

professional judgment and special skills, including her training as a background investigator and

her ability to interview sources, track down people and records, and write reports.  OPM and the

requesting agencies relied upon defendant's representations in her ROI's that the interviews and

record checks which she reported were completed were, in fact, performed.  As a result,

defendant was in a position with "substantial discretionary judgment that is ordinarily given

10

considerable deference" and was "subject to significantly less supervision." See U.S.S.G. § 3B1.3, comment n.1.  In addition, her "position of public or private trust . . . ma[de] the detection of the offense . . . more difficult." Id.  Accordingly, the two-level enhancement for abuse of a position of trust applies.

      C.  Defendant is not entitled to any adjustment for acceptance of responsibility.

Defendant is not entitled to a two-level decrease for acceptance of responsibility in light of her failure to terminate voluntarily her criminal activities.  Since the time of her wrongdoing in this case, defendant has continued to make false representations to the federal government and others, even while on release pending sentencing and as recently as August 12, 2012, when she had the temerity to apply to a government contractor for a position as an OPM background investigator.  Such ongoing criminal conduct while on release pending sentencing justifies denial of a two-point reduction for acceptance of responsibility.  See, e.g., United States v. Rhodes, 894 F. Supp. 1, 5 (D.D.C. 1995) (defendant's commission of bank fraud, pending sentencing on his conviction for bank fraud, rendered him ineligible for the two-level reduction for acceptance of responsibility despite his guilty plea), aff'd, 88 F.3d 1279 (D.C. Cir. 1996).  The Guidelines specify that a court, in its acceptance of responsibility determination, may consider whether the defendant has voluntarily terminated all criminal conduct.  See U.S.S.G. § 3E1.1, comment (n.1.b.); United States v. Mason, 966 F.2d 1488, 1497 (D.C. Cir.) (noting that the U.S. Sentencing Commission, by providing for a reduced sentence for a defendant who accepts responsibility for his crime, has determined that a defendant's "voluntary termination" of all criminal activity is a relevant factor), cert. denied, 506 U.S. 1040 (1992).  Where the defendant commits additional crimes while on release, a district court may view that as evidence that the

defendant has not voluntarily terminated all criminal conduct and lacks sincere remorse, and, accordingly, may decline to award a two-point reduction for acceptance of responsibility on that ground alone.  See United States v. O'Neil, 936 F.2d 599, 600-01 (1st Cir.1991) (district court could reasonably conclude that defendant's marijuana use in violation of bail conditions showed that he lacked "authentic remorse" for his crimes and could deny two-level reduction for acceptance of responsibility on that basis).  This is true even where the defendant, like Ms. Ocasio, has pled guilty.  Id. at 600-01; see also United States v. Morrison, 983 F.2d 730, 733-35 (6th Cir.1993); United States v. Reed, 951 F.2d 97, 99-100 (6th Cir.1991) ("Those who continue their crimes in jail and do not voluntarily withdraw from their criminal conduct demonstrate . . . a cynical and remorseless contempt for law.  Such continued criminal conduct is incompatible with the idea of acceptance of responsibility."), cert. denied, 503 U.S. 996 (1992); United States v. Shah, 263 F.Supp.2d 10, 37 (D.D.C. 2003) (denying any adjustment for acceptance of responsibility because defendant continued engaging in the narcotics trade while in jail), aff'd & judgment remanded, 453 F.3d 520 (D.C. Cir. 2006).

In this case, defendant not only continued to commit crimes while on release pending sentencing, but she used methods of deception similar to those she employed while working at OPM.  At OPM, she concealed her failure to obtain and review certain records – and thereby retained her employment for a time despite her misconduct – by brazenly misrepresenting that she had reviewed those records and reporting their purported contents.  Similarly, in her applications to DOEd and KeyPoint, defendant concealed the allegations of misconduct preceding her resignation from OPM, the suspension of her security clearance, and the criminal charge to which she had pled guilty – and thereby obtained (or almost obtained) new employment

– by blatantly lying in response to questions on those subjects.  As noted in the PSR, defendant's "behavior illustrates that she is continuing the same course of conduct."  (PSR ¶ 20a.) Defendant's false representations to DOEd and KeyPoint – as well as the notion that she would even attempt to obtain another job as a background investigator – are incompatible with genuine remorse and acceptance of responsibility for her conduct in this case.  Accordingly, the Court should deny her a two-level reduction for acceptance of responsibility.

## V.  **Defendant Should Be Sentenced to a Six-Month Period of Home Detention.**

The government respectfully submits that the factors set forth at 18 U.S.C. § 3553(a) support a sentence of a period of probation that includes as one of its conditions a six-month period of home detention, a sentence which is at the top of the Stipulated Guideline Range set forth in the parties' plea agreement, but which is at the bottom of the new Guideline Range arrived at by denying defendant a two-point reduction for acceptance of responsibility.[3]

---

[3] As this Court is aware, the district court needs to consider the goals of Section 3553 in determining the appropriate sentence, however, the court is not required to specifically refer to each factor listed in § 3553(a).  See United States v. Ayers, 428 F.3d 312, 315 (D.C. Cir. 2005). Section 3553(c) provides that the court at the time of sentencing shall state in open court the reasons for its imposition of a particular sentence.  Section 3553(a) specifically sets out the factors to be considered: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for the . . . offense . . . as set forth in the guidelines . . . (5) any pertinent policy statement issued by the Sentencing Commission . . . (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

A.   Nature of the Offense

Defendant did not choose to commit just one crime on one day.  Defendant admitted

during the plea proceedings that over a period of approximately five months she repeatedly made

false representations in her ROI's that she had reviewed certain records when she had not done

so.  As the statistical summary below demonstrates, OPM-FIS's recovery effort and analysis of

the interviews and record checks in defendant's ROI's revealed numerous instances of confirmed

falsifications,[4] possible falsifications, and source testimonies that could not be validated:

| | |
|---|---|
| Total cases in recovery project | 130 |
| Total sources | 335 |
| Sources with confirmed falsification | 42 |
| Sources with falsification indicators or source testimonies that could not be validated | 171 |
| % of sources with confirmed falsification, with falsification indicators, or source testimonies that could not be validated | 64% |

As Special Agent Newcomer stated in his affidavit, although there could be some instances

where source testimonies could not be validated for reasons unrelated to any falsification by

defendant, the large number of sources with confirmed falsification, with falsification indicators,

or source testimonies that could not be validated indicates that there was pervasive falsification

by defendant in this case.  (See Newcomer Aff. ¶ 5.)

Moreover, defendant compromised the integrity of all of her assigned background

investigations through her false representations in some ROI's.  The fact that the result of a

---

[4]All of the falsifications confirmed by OPM-FIS were falsified record checks.  Consistent with
defendant's admissions, no falsified interviews were found.

record check was provided when the record was not checked is enough to raise doubts about the entire investigation and the other work the investigator claimed to have performed.  Upon confirming even a single falsification in an ROI, OPM is required to undertake a full recovery effort.  (See Newcomer Aff. ¶ 6.)  Thus, defendant's crimes had far-reaching effects that extended well beyond the three dozen or so false statements which OPM's recovery effort confirmed.

As a background investigator for the federal government, defendant was – or should have been – aware of the importance of her work and the critical elements of trust and ethics inherent in her position.  As Merton Miller, Associate Director of OPM-FIS, explained, all background investigators for OPM receive an investigator's handbook, the first chapter of which is entitled "Investigator's Qualities, Conduct, Responsibilities, and the Government Code of Ethics," and which admonishes investigators that they must "NEVER falsify, manufacture, or enhance testimony, or in any way misrepresent any information collected from sources."  (Dkt. No.15, p. 2.)  Yet, defendant chose to flagrantly disregard this most basic duty – to accurately report the results of her investigations.  She did so knowing full well that federal agencies were relying on both the substance and integrity of her investigative reports in making hiring and security clearance determinations.  Her conduct was intentionally deceptive and carried out over the course of several months.  Indeed, had she not been caught, it is more than likely that she would have continued to falsify her work on background investigations.

B.  History and Characteristics of the Defendant

Defendant's history and characteristics suggest that a sentence that includes a six-month period of home detention is appropriate.  Defendant is 49 years old and has no criminal record.

(PSR ¶ 31.)  She currently resides with her boyfriend, grown daughter, and toddler grandson, and she maintains an "excellent" relationship with her daughter and a cordial relationship with her daughter's father (defendant's ex-husband).  (PSR ¶¶ 38-40.)  Although some defendants come before the Court for sentencing with limited educational or economic opportunities, defendant is not similarly situated.  Defendant completed college and had a lengthy career in the federal government.  (PSR ¶¶ 51, 56-59.)  Although she admitted her guilt early, her post-plea conduct is inconsistent with acceptance of responsibility and true remorse.  (PSR ¶ 74a.)

    C.  <u>The Need for the Sentence to Reflect the Seriousness of the Offense</u>

    The issuance of a security clearance or a job offer to someone whose background has not been properly investigated can pose a serious risk to national security and to the effectiveness of the federal civilian workforce.  As Associate Director Miller explained, "agencies rely on the integrity and completeness of OPM's background investigation when making their adjudicative decisions."  (Dkt. No. 15, p. 1.)  Associate Director Miller further stated that "the integrity of an OPM background investigation is paramount to protecting national security and promoting the efficiency of the Federal service."  (<u>Id.</u>, p. 2.)

    Even where a record, the report on which was falsified by defendant, is later reviewed and provides no derogatory information about the applicant, the damage to the integrity of the investigation remains.  As Associate Director Miller explained,

> Any question concerning the accuracy and truthfulness of the testimonies in the ROI makes the entire investigation suspect.  It does not matter if the source would have provided favorable information anyway or that a record check would have resulted in no identifiable records or adverse information.  The fact that testimony was attributed to a source who was not interviewed or the result of a record check was provided when the record was not checked is enough to raise doubts about the entire investigation and the other work the investigator claimed to have performed.

(Dkt. No. 15, p. 2.)  Upon discovering a falsified interview or record check in an ROI, OPM must recontact all sources in the ROI and remove all falsified entries from the ROI in order to ensure that the ROI is completely accurate.  OPM generally replaces any falsified testimony with either new testimony obtained from the source in question or testimony obtained from one or more additional sources.  As Associate Director Miller stated, the "cost of investigating and correcting the investigator's cases is substantial – both in time and money."  (Dkt. No. 15, p. 2.)  Beyond the cost of the recovery effort, Associate Director Miller explained that the "cost associated with potential compromise of our nation's security and the trust of the American people in its government's workforce" is an intangible figure that cannot be easily determined.  (Id., p. 3.)

      D.  <u>The Need for the Sentence to Afford Adequate Deterrence</u>

Given defendant's post-plea conduct, there is a significant risk that defendant will commit additional crimes in the future.  This confirms the need for specific deterrence of defendant through imposition of a harsher sentence than the parties' plea agreement contemplated.  However, given defendant's early admission of guilt and resignation from her position at OPM, a sentence that includes a six-month period of home detention should be sufficient to promote respect for the law and, as Associate Director Miller explained, "to show that this type of conduct is not tolerated by the Court or OPM."  (Dkt. No. 15, p. 3.)

      E.  <u>The Need for the Sentence to Provide Educational or Other Benefits</u>

Unlike many of the defendants who appear before this Court, defendant has little need for the sentence to provide her educational or vocational training.  Defendant has had the benefit of college and on-the-job training during her lengthy career in the federal government.

F.  The Need to Avoid Unwarranted Sentence Disparities

As is clear from the attached chart (Exhibit 6), five different judges of the U.S. District Court for the District of Columbia have come to the same conclusion in six cases (Domico, Weeks, Walker, Fitzgerald, Webb, and Marchand) that involved nearly the same offense conduct as the instant case: that a federal background investigator who admitted falsifying background investigation reports, after OPM-FIS had completed a full recovery effort, deserved a sentence that included several months in prison.  In three of those cases, the defendant received a sentence of five months of incarceration, followed by a term of supervised release that included a five-month period of home detention, and an order to pay full restitution.  Unlike those cases, defendant in the instant case admitted falsifying background investigation reports before OPM-FIS had completed (or even really begun) a full recovery effort, thus enabling OPM-FIS to focus its recovery effort and conserve resources.  Like the instant defendant, former contract investigator Ronald Payton pled guilty before OPM-FIS had made much progress on its recovery effort and thus received the benefit of a capped estimated loss amount of $10,000.  Although this loss amount put Mr. Payton in a probation-eligible guideline range, Mr. Payton, like the instant defendant, made false statements in job interviews while he was on release pending sentencing. Thus, he was sentenced to a period of probation that included 180 days of home detention.  There is little distinction between the instant case and Mr. Payton's case that would warrant deviating significantly from the sentence that Mr. Payton received.  Thus, it is the government's position that a sentence of a period of probation that includes as one of its conditions a six-month period of home detention is consistent with "the need to avoid unwarranted sentence disparities among

defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(1)(6).

## VI.  **Restitution**

As set forth in the written plea agreement, defendant agreed to pay restitution in the amount of $10,000 to OPM.  (PSR ¶ 90.)  Accordingly, the Court should order restitution in this amount.

**Conclusion**

WHEREFORE, the government respectfully requests that this Court impose a sentence of a period of probation that includes as one of its conditions a six-month period of home detention, and order defendant to pay full restitution to OPM.

Respectfully submitted,

RONALD C. MACHEN JR.
United States Attorney
DC Bar 447889


        /s/
ELLEN CHUBIN EPSTEIN, DC Bar 442861
Assistant United States Attorney
Fraud & Public Corruption Section
555 Fourth Street, N.W., 5th Floor
Washington, DC 20530
(202) 252-1773
Ellen.Chubin@usdoj.gov